**COMMONWEALTH of Pennsylvania, Appellant, No. 1803 WDA 2010,**

v.

**Ryan CULVER, Appellee.**

**Commonwealth of Pennsylvania, Appellee**

v.

**Ryan S. Culver, Appellant, No. 1821 WDA 2010.**

Superior Court of Pennsylvania.

Argued May 15, 2012.
Filed Aug. 21, 2012.

James P. Carbone, Assistant District Attorney, Franklin, for Commonwealth.

Blair H. Hindman, Clarion, for Culver.

BEFORE: MUSMANNO, J., BENDER, J., and STRASSBURGER*, J.

OPINION BY BENDER, J.:

The Commonwealth, Appellant/Cross–Appellee, appeals from the trial court's order in arrest of judgment, which granted a new trial due to prosecutorial misconduct. Ryan Culver ("Culver"), Appellee/Cross–Appellant, appeals from the trial court's contemporaneous order denying preclusion of retrial based upon double jeopardy grounds. After careful review, we affirm both orders.

The facts underlying Culver's conviction are not germane to the disposition of the instant appeal, however, a brief summary of the facts follows in order to provide context to the prosecutorial misconduct claims.

On January 17, 2008 at approximately 7:30 p.m., a one-year-old male infant, B.C., suffered severe head and facial injuries while in Culver's care. S.F., B.C.'s mother, left B.C. in Culver's care for about fifteen minutes while she made a phone call from a neighboring apartment. There was no evidence of any injury to B.C. when S.F. left B.C. with Culver. When S.F. returned to the apartment 15 minutes later, however, she found B.C. on the floor in the living room with a washcloth inserted into his bleeding mouth. An ashtray was lying next to him. Culver claimed

---

* Retired Senior Judge assigned to the Superior Court.

that B.C. had fallen off a stool, hit a nearby table, and then struck the floor. Culver said the ashtray had been knocked off the table and then fell onto B.C., striking his head. During the ensuing six hours, B.C.'s condition deteriorated; he was observed to be lethargic, had staring episodes, and appeared to be more off-balance than usual. Finally, B.C. was taken to the hospital in the early morning hours of January 18, 2008.

At the hospital, the treating emergency room physician, Dr. Randy Boggess, found that B.C. had suffered a myriad of injuries, the least of which were numerous cuts and bruises to his mouth, face, and head. The most serious injury discovered was an occipital skull fracture. Dr. Boggess testified that such an injury required a significant application of force, and he did not believe that the injury was consistent with Culver's version of events. Furthermore, Dr. Boggess testified that the numerous cuts and bruises on various parts of B.C.'s head and face were also not consistent with Culver's story of how B.C. came to be injured.

Following the initial examination, B.C. was then transported to Children's Hospital. Once there, he was examined by Dr. Janet Squires, a child abuse consultant. She found that B.C.'s injuries were far more consistent with abuse rather than with an accidental fall. She determined that B.C. had suffered a minimum of four distinct impacts to the face, in addition to the impact that injured the back of his skull. Of particular note was the injury to the frenulum, the thin bridge of tissue that connects the gum to the upper lip. She indicated that such an injury was unlikely to have been cause by accident and was instead highly suggestive of physical abuse.

As the investigation continued, Culver's account of the events causing B.C.'s injuries changed, including Culver's account of his own involvement in causing the injuries. State Trooper Mark Russo (Russo) testified that on July 1, 2008, Culver told him that he (Culver) had been playing with B.C. by lifting B.C. up by his arms and swinging him around in a circular motion. Culver said he then lost his grip, causing B.C. to slip through his hands and crash into a table and stool on his way to the ground.

Culver admitted to Russo that his initial account of events was fabricated. He told Russo that he placed the ashtray next to B.C. in order to make it look like it had fallen off the table onto B.C. Culver said he staged the scene to cover up his own involvement in causing B.C.'s injuries, and to substantiate the injury to B.C.'s skull. Culver said he had been using prescription medications recreationally, and that he was fearful that S.F. would think ill of him if he revealed the real cause of B.C.'s injuries. He also told Russo he had been worried because he feared getting into trouble with authorities due to his use of someone else's prescription medication. This version of events, including Culver's admission that he had lied previously about the real cause of B.C.'s injuries, was memorialized in a statement that was ultimately admitted into evidence.

After a four day trial that ended on March 19, 2010, Culver was convicted of aggravated assault and endangering the welfare of children.[1] On May 25, 2010, Culver was sentenced to a mandatory term of 5–10 years' incarceration for aggravated assault, and a consecutive term of 5 years'

---

1. Culver was found guilty of aggravated assault under the theory of having caused serious bodily injury. He was acquitted of a separate count of aggravated assault that alleged he had attempted to cause serious bodily injury.

probation for endangering the welfare of children. Culver filed timely post-sentence motions on June 4, 2010.

In his post-sentence motions, Culver sought arrest of judgment premised upon a claim of prosecutorial misconduct.[2] The trial court held a hearing on the post-sentence motions on September 9, 2010, at which time additional testimony was received by the court. On October 25, 2010, the trial court issued an order and supporting opinion granting Culver a new trial due to prosecutorial misconduct. The trial court also denied Culver's double jeopardy claim to preclude retrial.

The Commonwealth appealed the order granting a new trial, and Culver appealed the double jeopardy determination. In the Commonwealth's appeal, the Commonwealth raises several related claims that collectively assert that the trial court abused its discretion, or otherwise committed errors of law, when it granted Culver's post-sentence motion for arrest of judgment based upon prosecutorial misconduct. The Commonwealth contends that certain alleged acts of misconduct did not occur, that those acts of misconduct that might have occurred were nonetheless cured by cautionary instructions given to the jury, that particular misconduct claims had been waived by Culver and that, ultimately, the purported acts of prosecutorial misconduct did not, individually or collectively, deprive Culver of a fair trial. In Culver's appeal, he claims that retrial is barred by application of his double jeopardy rights because he alleges that the prosecutor intentionally engaged in misconduct for the purpose of denying him a fair trial. We will address the Commonwealth's appeal first.

## Procedural Misconduct

■ In criminal trials, declaration of a mistrial serves to eliminate the negative effect wrought upon a defendant when prejudicial elements are injected into the case or otherwise discovered at trial. By nullifying the tainted process of the former trial and allowing a new trial to convene, declaration of a mistrial serves not only the defendant's interest but, equally important, the public's interest in fair trials designed to end in just judgments. Accordingly, the trial court is vested with discretion to grant a mistrial whenever the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial. In making its determination, the court must discern whether misconduct or prejudicial error actually occurred, and if so, ... assess the degree of any resulting prejudice. Our review of the resulting order is constrained to determining whether the court abused its discretion. Judicial discretion requires action in conformity with [the] law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason.

*Commonwealth v. Lettau,* 955 A.2d 360, 363 (Pa.Super.2008) (internal citations and quotation marks omitted) *rev'd on other grounds,* 604 Pa. 437, 986 A.2d 114 (2009). Thus, we review the trial court's determination that a new trial was warranted due to prosecutorial misconduct for abuse of discretion. We cannot reverse that judgment unless it is clear that the trial court misapplied the law or acted unreasonably in the exercise of its discretion.

**2.** Culver also sought relief based upon claims of insufficiency of the evidence and that the verdict was against the weight of the evidence. Those issues are not the subject of the instant appeal.

In its opinion, the trial court found several instances of prosecutorial misconduct that the court concluded had collectively contributed to its finding that Culver had been prejudiced to the point where he had been deprived of a fair and impartial trial. First, "[d]espite instruction by the Court to cease doing so [during both opening and closing arguments], the [prosecutor] continued to physically intimidate the Defendant during his closing argument by invading the personal space of the Defendant and his attorney by pointing his finger in their faces." Trial Court Opinion (T.C.O.), 1/5/11, at 17. Contributing to this finding was the fact that the prosecutor "was yelling and menacing as he repeatedly put his finger in the faces of the Defendant and defense counsel." *Id.* at 18.

Second, the trial court found that the prosecutor made a series of statements asserting his personal beliefs during closing arguments. Specifically, the prosecutor told the jury that Culver was "the most unreliable historian we're ever going to meet[,]" "probably the most unreliable, unbelievable person that you are ever going to come across[,]" and that Culver was "lying, lying, lying, lying, and lying." *Id.* at 18 (citing N.T., 3/19/10, at 109, 140, 141). The prosecutor also told the jury during closing arguments that Culver was "somewhat the compulsive or pathological liar...." N.T., 3/19/10, at 115.

Third, the trial court found that the prosecutor told the jury during opening argument that certain evidence would be presented that, it would later be revealed, did not exist. The prosecutor stated during his opening argument that "the doctors were sent the statement made by the De-

fendant to Trooper Russo and that they 'looked at it' and that that version of how the injuries were sustained was also inconsistent with the minor child's injuries." T.C.O. at 18–19.[3] However, the trial court indicated that:

> Dr. Squires stated during her testimony that she "doesn't remember being told a different version." [N.T., 3/18/10, at 153]. At sidebar, the [prosecutor] then stated that he talked to another professional in the office, the child advocate, and that he anticipated Dr. Squires would opine the same. [N.T., 3/18/10, at 154–158]. Therefore, the Court finds that the [prosecutor] misled the Court and the Defendant when giving a proffer regarding what Dr. Squires would testify to regarding the second version of the story as he never spoke to her regarding this evidence prior to trial.

*Id.* at 19.

Finally, the trial court determined that the prosecutor repeatedly asked leading questions of the Commonwealth's witnesses over the objections of defense counsel which were repeatedly sustained by the trial court, stating that "[i]t is clear from the record that the trial court showed an intolerance for leading questions that the [prosecutor] ignored." *Id.* at 15.

The trial court took various remedial steps in an attempt to alleviate the prejudice caused by the numerous incidences of prosecutorial misconduct, including admonishing the prosecutor at sidebar and providing curative or cautionary instructions to the jury. At one point, when the defense requested a mistrial because the prosecutor had answered a question for his own witness, the trial court denied the

---

**3.** The trial court referred to the following statement by the prosecutor during opening arguments: "the doctors are going to tell you that ... Mr. Carbone sent us the statement the Defendant made and we looked at that

and ... [e]ven though you think it's believable we don't buy it ... it's an inflicted injury. It's not accidental trauma...." N.T., Commonwealth Opening Statement, at 31.

motion because "[a]t the time of the request, the Court believed that denying the request for a mistrial and giving the jury cautionary instructions would be sufficient to overcome any prejudice to the Defendant." *Id.* at 11. However, after the trial court reviewed the record in its entirety when considering Culver's post-sentence motions, the trial court found that "the cumulative effect of the [prosecutor's] behavior during the trial was enough to deny the Defendant a fair trial and prevented the jury from rendering a true verdict." *Id.* at 12. We will first address each instance in which the trial court found prosecutorial misconduct to determine if prosecutorial misconduct indeed occurred. We will then conclude by addressing the prejudice of each instance of misconduct as applied both individually and collectively to determine if Culver was deprived of a fair and impartial trial.

### A. Waiver

■ We address the issue(s) of waiver as a threshold matter. The Commonwealth's first argument is that numerous individual allegations of misconduct had been waived by Culver for failure to ask for a mistrial or otherwise object to every specific act of misconduct. This argument is unresponsive to the issue at hand and, for the most part, disingenuous. Culver requested a new trial in post-sentence motions due to cumulative effect of many individual acts of prosecutorial misconduct in this case, and the new trial was granted in response to that motion. The trial court did not grant a new trial exclusively due to any individual act of prosecutorial misconduct. Instead, the Court found the cumulative effect of the numerous acts of prosecutorial misconduct constituted sufficient prejudice as to warrant a new trial.

Nonetheless, relevant to allegations of procedural misconduct at issue in the instant appeal, defense counsel specifically objected to the prosecutor's invasion of his and Culver's personal space during the Commonwealth's opening statement. N.T., Commonwealth Opening Statement, at 11. The same behavior was cause for objection on three occasions during the prosecutor's closing statement. N.T., 3/19/10, at 113, 122, 126. Objections were made to the prosecutor's repeated injection of his personal beliefs regarding the veracity of Culver during closing arguments, ultimately requiring cautionary or curative instructions. *Id.* at 141–143. Objections were made during closing arguments to the prosecutor's mischaracterization of the evidence presented by expert witnesses, again requiring curative instructions. *Id.* at 144–149. The prosecutor's mischaracterization of similar evidence during the Commonwealth's opening statement was not subject to an objection. N.T., Commonwealth Opening Statement, at 31. However, this was because the prosecutor's misconduct was not discovered until the second day of trial. N.T., 3/18/10, at 149–158.

■ Furthermore, "in order to evaluate whether ... comments were improper, we do not look at the comments in a vacuum; rather we must look at them in the context in which they were made." *Commonwealth v. Rolan*, 964 A.2d 398, 410 (Pa.Super.2008) (quoting *Commonwealth v. May*, 587 Pa. 184, 898 A.2d 559, 567 (2006)). While not every single act of prosecutorial misconduct was subject to a specific objection by defense counsel in this case, we must review those acts of misconduct that were subject to objections in the context in which they were made. Here, the objections of defense counsel typically occurred after the prosecutor had repeatedly engaged in questionable or improper commentary or conduct. The context in which objections to individual acts of misconduct were made is colored

by the fact that such acts were not isolated transgressions. Accordingly, we conclude that the Commonwealth's claim that the issues of prosecutorial misconduct were inadequately preserved by the defense is wholly without merit. We have reviewed the record and determined that each allegation of prosecutorial misconduct discussed herein has been sufficiently preserved in the trial court as to dispel any waiver concerns.

## B. The prosecutor's menacing behavior during opening and closing argument

■ The Commonwealth contends that "there is absolutely no mention in the entire four day trial transcript of the [prosecutor] yelling or physically intimidating and threatening Culver as alleged in the trial court's opinion." Commonwealth's Brief, at 19. The Commonwealth continues, "[a]pparently unable to find facts of record to support the grant of a new trial, the trial court interjected inflammatory rhetoric that is not in the record on appeal and was not found objectionable by defense counsel or the court at the time." *Id.* Essentially, the Commonwealth[4] asserts that there is no evidentiary record demonstrating the claims of physical and verbal intimidation that occurred during the opening and closing arguments, and thus the trial court's conclusion that such behavior constituted prosecutorial misconduct causing sufficient prejudice to warrant a new trial was an abuse of discretion.

### 1. Merit

The trial court was unequivocal in its recollection that the "[prosecutor] was more than animated. He was yelling and menacing as he repeatedly put his finger in the faces of the Defendant and defense counsel." T.C.O., at 18. At oral argument, however, A.D.A. Carbone asserted that the trial court opinion was not part of the record, and also continued to argue that the trial court's recollection of his behavior during the Commonwealth's opening and closing statements was fabricated.

We note that this panel's observations of the prosecutor's behavior during oral argument were consistent with the trial court's account and the allegations made by the defense. We observed that A.D.A. Carbone was animated during his presentation, consistent with the account of his behavior at trial as described by the trial court. Furthermore, the volume and tone of his voice during oral argument were inappropriate for an appellate courtroom, as they would have been in any legal forum.

Nonetheless, this Court's observations of the prosecutor's behavior during oral argument merely corroborated, rather than affirmatively established, the factual basis for the specific allegations of prosecutorial misconduct alleged to have occurred at trial. Such claims must ultimately be borne out by the record. The prosecutor's argument that the trial court opinion is not part of "the record," however, is no more than a semantical dispute of form over substance. To be fair, the trial court opinion is not part of the "evidentiary record" in the same manner that a transcript of a proceeding or an evidentiary exhibit could be characterized. However, the trial court

---

4. At this point we note, to ensure the proper context of these allegations, that the Assistant District Attorney ("A.D.A.") who argued for the Commonwealth at trial in this case, James P. Carbone, Esq. ("Carbone"), is also the attorney representing the Commonwealth on appeal and the author of the Commonwealth's brief in this matter. Mr. Carbone appeared before this panel during oral argument representing the Commonwealth, and to a large extent, himself.

opinion, and also the opinion in support of the order granting post-sentence motion relief that was incorporated into the trial court's Pa.R.A.P. 1925(a) opinion, are legal papers filed with the lower court and certified by the Prothonotary and Clerk of Courts of Venango County, as reflected by the certified copy of the docket entries in the instant case. *See* Pa.R.A.P. 1921 (composition of record on appeal); *see also* Pa.R.A.P. 1931 (transmission of the record).

Furthermore, the Commonwealth's assertion that the record is bereft of evidence of A.D.A. Carbone's physically menacing behavior, or that there is no evidence of the volume and tone of the prosecutor's voice, because those actions were not transcribed by the court reporter, is an argument bordering on frivolousness. Appellate courts are necessarily reliant on the observations of trial court judges for non-verbal actions occurring during the course of legal proceedings. Transcripts rarely contain any mention of physical behaviors that occur in courtrooms, nor do they indicate certain characteristics of speech such as volume and tone. The difference between a whisper and a scream is not easily conveyed in the black and white print of a trial transcript, nor are the gesticulations of an animated speaker. The failure of a court reporter to transcribe non-verbal behaviors in no way discredits a trial judge's observations of such conduct.

For all the above reasons, the Commonwealth's argument that the "record" does not demonstrate the non-verbal aspects of alleged misconduct claims or those related to the tone and volume of the prosecutor's voice are devoid of merit. The claim that the trial court fabricated its account of these events is also baseless. And because the Commonwealth does not dispute that such inappropriate behavior, if it occurred, constitutes prosecutorial misconduct, we turn to the issue of prejudice.

## 2. Prejudice

█ Regarding the prejudice caused to Culver due to the prosecutor's behavior in front of the jury, including his animated and intimidating behavior during the opening and closing statements, we conclude that it was not an abuse of discretion for the court to determine that the resulting prejudice to Culver was significant such as to warrant the grant of a new trial. While Pennsylvania courts do permit some degree of oratorical or rhetorical flair, it is unbecoming of an officer of the court to engage in the acts of intimidation that occurred in this case.

It might be excused that, during the course of the presentation of an opening or closing argument, a prosecutor points his finger at a defendant or defense counsel to emphasize a particular point. It might also be excused that, while lost in the heat of argument, a prosecutor made such a gesture in close proximity to the defense table, unaware that he had inadvertently invaded the personal space of the target. Here, however, such actions were observed on multiple occasions during both the opening and closing statements. The trial court reported that these physically menacing actions were accompanied by yelling and other animated displays, and that the prosecutor continued to engage in these behaviors despite repeated warnings from the trial court.

At best, such behaviors demonstrate a lack of professionalism in the courtroom. At worst, they could be interpreted as intentional conduct intended to inflame the passions of the jury or to instigate a reaction from the defendant or his counsel. What is clear is that such behavior has no part in the rational, logical, and contempla-

tive evaluation of the evidence that should occur during a criminal trial.

The deprivation of an individual's liberty should never turn upon the theatrical presentation of arguments or evidence, the volume and tone of an advocate's voice, or due to physical acts of intimidation. That such behavior occurred in front of a jury only serves to increase its potential prejudicial effect. While we might presume that a trial judge could resist the prejudicial effect of such theatrics, especially where the trial judge had prior experience with a particularly dramatic attorney, we cannot assume the same when a case is tried before a jury. A jury might well become distracted from their task by the theatrics of an over-zealous prosecutor. We, therefore, have no reservation in determining that the trial court did not abuse its discretion in determining that these events contributed greatly to denying Culver a fair and impartial trial. We also conclude such misconduct could alone serve to justify the granting of a new trial, because the offensive behavior in question was not an isolated event.

### C. The prosecutor's remarks during closing argument calling into question Culver's veracity

██ The Commonwealth next claims that the prosecutor's repeated remarks during closing statements referring to Culver as a liar were fair response to the remarks of Culver's attorney during the defense's closing remarks, and that they were also appropriate in the context of the facts of the case. Indeed, Culver admitted to lying when he gave the July 1, 2008 statement to Trooper Russo. It is also true that during his closing statement, defense counsel admitted that Culver lied to authorities and the victim's mother prior to the July 1, 2008 statement.[5] N.T., 3/19/10, at 85.

### 1. Merit

██ The Commonwealth is entitled to comment during closing arguments on matters that might otherwise be objectionable or even outright misconduct, where such comments constitute fair response to matters raised by the defense, or where they are merely responsive to actual evidence admitted during a trial. *See Commonwealth v. Trivigno*, 561 Pa. 232, 750 A.2d 243, 249 (2000) (plurality opinion) ("A remark by a prosecutor, otherwise improper, may be appropriate if it is in fair response to the argument and comment of defense counsel") (citing *United States v. Robinson*, 485 U.S. 25, 31, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988)); *Commonwealth v. Marrero*, 546 Pa. 596, 687 A.2d 1102, 1109 (1996). Furthermore, "prosecutorial misconduct will not be found where comments were based on the evidence or proper inferences therefrom or were only oratorical flair." *Commonwealth v. Jones*, 542 Pa. 464, 668 A.2d 491, 514 (1995).

For instance, in *Commonwealth v. Carson*, 590 Pa. 501, 913 A.2d 220, 238 (2006), after Carson's defense counsel told the jury that the prosecutor in that case would "do anything and say anything in order to

---

5. Culver's attorney made several comments downplaying Culver's initial dishonesty:

> That's one of the big things in this case is that Ryan Culver told a story to his girlfriend that wasn't true … [b]ut, because you tell a lie in a moment of stress doesn't mean you're the kind of man that would beat a child like that. Those two things are not equal. What they have attempted to do

> is make you dislike this young man, and hear that lie over and over and say well, if he lied about it, he must have done it. You can't insinuate that.

N.T., 3/19/10, at 85. Later, Culver's attorney stated, "[h]e lied, he lied, he lied, okay, okay. But, what's the proof in this case? What do the facts say? That doesn't mean that he committed this heinous act." *Id.* at 88.

engineer a guilty verdict in a case[,]" our Supreme Court determined that it was fair response when the prosecutor stated: "[w]ell, if I were that type of a guy, you would probably see about ten eyewitnesses up there all having been paid in full." Our Supreme Court ruled that the prosecutor's statement in *Carson* was "fair response to defense counsel's largely improper and baseless implication that the prosecutor would behave unethically, or indeed, criminally, in order to win cases." *Id.*

In another example, the prosecutor in *Commonwealth v. Ligons*, 565 Pa. 417, 773 A.2d 1231 (2001), made the following statement to the jury during closing argument of the penalty phase in a capital case:

What you heard today revolved around one person, the defendant. You heard nothing about [the victim] today but you must remember that this case really is about [the victim] and the fact that he did not have opportunities to be with his family, to be with his children, to be with his wife, mother, brothers, sister, after this incident. He was only 31 years old. He was trying to make a living. He was trying to earn whatever you could earn as a pizza deliveryman. The defendant didn't take the effort, didn't make the effort to do that himself, to help support his family. He let his grandmother support his girlfriend and his child for him, not because he was lacking in intelligence or even lacking in ability to work and earn money.

*Id.* at 1238. The defense argued on appeal that the prosecutor's statement "improperly interjected victim impact evidence into the case, when such evidence had not been presented during the penalty hearing." *Id.* Our Supreme Court disagreed, reasoning that:

[h]ere, although the prosecutor's argument did not constitute victim impact evidence, as the arguments of counsel

are not evidence ... the commentary touched upon the circumstances of the victim and his family. Ligons, however, offered, as mitigating circumstances, evidence that he was a good father, helped care for his grandmother, endured a troubled and difficult childhood, and had been unloved and abandoned by his mother. The prosecutor's remarks were offered to counter the sympathy associated with Ligons' mitigating evidence by contrasting his circumstances with those of the victim. Given such context, we decline to conclude that the remarks so prejudiced the jury that it could not weigh the evidence objectively and render a true verdict.

*Id.* at 1238–39 (internal citations omitted).

In the instant case, the prosecutor did not merely comment upon Culver's statement to Trooper Russo in which Culver admitted that his initial account to the victim's mother and authorities was a lie. The prosecutor also went far beyond fair commentary on the defense argument that Culver's dishonesty did not constitute substantive proof that a crime had occurred. The prosecutor's statements during closing arguments were rife with excessive hyperbole that went far beyond permissible oratorical flair.

It was not merely oratorical flair or fair comment to state that Culver was "the most unreliable historian we're ever going to meet[,]" or that Culver was "probably the most unreliable, unbelievable person that you are ever going to come across." N.T., 3/19/10, at 109, 140. There also was absolutely no evidence that Culver was a "compulsive or pathological liar." *Id.* at 141. It would not be improper or unfair response for the Commonwealth to assert that Culver's self-serving deception provided a reasonable inference of wrongdoing. We could also countenance a reasonable degree of embellishment in making that

point. However, in this instance, the prosecutor went too far. It is one thing to call the defendant a liar when there is clear evidence supporting that claim, or that his admitted prior fabrications make it more likely that Culver's revised story also lacked credibility. It is quite another to claim Culver was the most unreliable or most unbelievable person *ever*, and it was particularly egregious to state or imply that Culver had a psychological condition that makes it impossible for him to tell the truth.

Accordingly, we conclude that the trial court did not abuse its discretion in determining that the prosecutor's comments during closing arguments constituted prosecutorial misconduct.

## 2. Prejudice

 Next, we consider the prejudice caused by the repeated remarks made during the prosecutor's closing statement regarding the veracity of Culver. Our Supreme Court "has repeatedly recognized that the prosecutor's unique position as both an administrator of justice and an advocate gives him a responsibility not to be vindictive or attempt in any manner to influence the jury by arousing their prejudices." *Commonwealth v. Revty*, 448 Pa. 512, 295 A.2d 300, 302 (1972). However, while a closing argument must be based upon evidence in the record or reasonable inferences therefrom, *see Commonwealth v. Colson*, 507 Pa. 440, 490 A.2d 811, 824 (1985), a prosecutor is permitted to respond to defense evidence and engage in oratorical flair. *See Commonwealth v. Basemore*, 525 Pa. 512, 582 A.2d 861, 869 (1990).

In *Revty*, sufficient prejudice was found to warrant a new trial where "the District Attorney implied [during closing arguments] that the appellant had attempted to deceive the jury intentionally as to the circumstances of his discharge from the United States Army and that the jury therefore could infer that the self-defense plea was a similar deception." *Revty*, 295 A.2d at 301. The prosecutor's remarks in *Revty* had been preceded by several comments made by the prosecutor that drew the jury's attention to the honorable discharge pin worn by the defendant. *Id.* at 301–02. In contrast, however, where improper commentary on the veracity of a defendant is an isolated, singular occurrence, prejudice warranting a new trial is unlikely to result. *See Commonwealth v. Riley*, 459 Pa. 42, 326 A.2d 400 (1974).

Culver did not testify in his own defense. However, Culver's multiple statements to authorities were admitted through the Commonwealth's various witnesses. Culver's account of events leading to B.C.'s injuries changed when he gave a statement to Trooper Russo on July 1, 2008, at which time Culver admitted to having lied on previous occasions to protect himself from blame. Accordingly, Culver's admitted deception permitted some degree of prosecutorial comment and argument regarding the veracity of his second account of events, and this was true regardless of the fact that defense counsel had drawn attention to the fact that Culver's initial explanation of the cause of B.C.'s injuries was a falsification.

However, the prosecutor went beyond permissible commentary and argument when he drew inferences far beyond what the evidence could reasonably support. Such superlatives are simply out-of-bounds in any courtroom, particularly coming from a prosecutor. That these types of outrageous superlatives were repeatedly used with reckless abandon in a case where the defendant had not even testified greatly increased their potential for prejudicial effect.

Furthermore, the statement that Culver was a compulsive or pathological liar carried the added risk that the prosecutor was putting facts before the jury that were not in evidence. The implication of such a statement was that Culver had a psychological condition that rendered him incapable of telling the truth. Such a statement easily could inflame the passions of the jury and cause rampant and unfounded speculation, even if accompanied by a cautionary instruction. Accordingly, we discern no abuse of discretion on the part of the trial court in determining that the prosecutor's repeated hyperbolic statements to the jury concerning Culver's veracity caused sufficient prejudice as to warrant a new trial.

**D. The prosecutor's misrepresentation of evidence admitted at trial and related misrepresentations to the trial court and to defense counsel regarding the testimony of Dr. Squires**

■ We next consider the trial court's finding of prosecutorial misconduct based upon the prosecutor's reference to evidence that would be presented that was ultimately found not to exist, and subsequent reference to the same evidence during closing arguments despite the fact the trial court had barred testimony on the subject. The evidence in question is the purported testimony of Dr. Squires regarding her evaluation of Culver's statement to Trooper Russo.

**1. Merit**

In the Commonwealth's opening statement, the prosecutor stated that the doctors testifying in this case were sent the

statement made by Culver to Trooper Russo, that they reviewed it, and that they determined that the injuries sustained by B.C. were inconsistent with Culver's revised version of events.[6] When the matter was raised during the direct examination of Dr. Squires, however, it was revealed that the prosecutor had not spoken to Dr. Squires prior to the trial about the statement.

When asked if she was presented with Culver's statement to Trooper Russo, the following exchange occurred between the prosecutor and Dr. Squires:

Q. Doctor, I know at the hospital you were only supplied with that version, but you recently learned that, in fact, there was yet another version that was presented, at least to the police, correct?

A. You told me that before this. I don't have any memory that I was told that before. It's possible. You know, I get a lot of calls. I don't want to say definitively. I don't remember being told a different version.

Q. Just so we get it correct, I am going to hand you a copy of the Pennsylvania State Police Report and there is that certain paragraph. I did try to show it here before.

A. You mentioned that today [the second day of trial], yes.

N.T., 3/18/10, at 153.

It was then revealed during a sidebar that the prosecutor had not, in fact, spoken with Dr. Squires prior to the trial regarding Culver's statement to Russo. Instead, the prosecutor said that he communicated with *Dr. Squires' office* and that *someone*

---

**6.** During the Commonwealth's opening statement, the prosecutor said:

Well, the doctors are going to tell you that, you know what, [the prosecutor] sent us the statement the defendant made and we looked at that and no, that's not it either.

Even though you think it's believable we don't buy it. It's not true. Yeah, it's an inflicted injury. It's not accidental trauma but it didn't happen the way you said. . . . N.T., Commonwealth Opening Statement, at 31.

*other than Dr. Squires* told him that the injuries were not compatible with the new account of events, but the prosecutor was unable to speak with Dr. Squires directly about the statement. *Id.* at 153–154. The prosecutor first spoke directly with Dr. Squires about the statement on the second day of trial, despite having represented to the defense and to the trial court to the contrary. *Id.* at 155.

The Commonwealth argues that the prosecutor's statement during opening argument was not misleading because Dr. Squires was "fully prepared to testify that the alternative accidental scenario provided by Culver was not compatible with the location, distribution, and severity of injuries to the victim." Commonwealth's Brief, at 27. Thus, the Commonwealth contends that since Dr. Squires was prepared to testify in conformity to the prosecutor's theory of the case, it was immaterial that he had misrepresented how and when she was provided with Culver's statement to Trooper Russo, and thus Culver suffered no prejudice as a result.

Due to the prosecutor's misrepresentations of Dr. Squires' opinion to the defense and to the trial court prior to trial, and to the jury during the Commonwealth's opening statement, Dr. Squires was not permitted to address Culver's statement to Trooper Russo during her testimony. Nonetheless, the prosecutor asserted during its closing argument that "all the medical experts, it's uncontroverted, are saying that the version, the final version he gives, still is not compatible with the truth." N.T., 3/19/10, at 144. This caused yet another sustained objection during closing arguments, requiring the trial court to issue yet another cautionary instruction to the jury. *Id.* at 144–149.

Without citation to any legal authority, the Commonwealth claims that the finding of prosecutorial misconduct and prejudice based upon the events surrounding the prosecutor's mischaracterization of the evidence concerning Dr. Squires' review of Culver's statement to Trooper Russo was a "gross misapplication of the law." We disagree. It was prosecutorial misconduct for the prosecutor to issue a proffer to defense counsel and the court that it knew to be untrue, even if the prosecutor had correctly made an educated guess regarding the likely nature of Dr. Squires' testimony. It was prosecutorial misconduct to give the same misrepresentation of fact to the jury during opening arguments, and it was even greater prosecutorial misconduct to again misrepresent those facts to the jury during closing arguments, despite having been previously reprimanded by the court over the same matter. The Commonwealth's argument regarding this series of events is devoid of merit.

## 2. Prejudice

■ Next, we consider the prejudice caused by the prosecutor's misrepresentations regarding Dr. Squires' opinion of Culver's statement to Trooper Russo. We believe prejudice of such an occurrence is readily apparent. The prosecutor told the jury, at the beginning and the end of the case, that certain expert scientific evidence existed that disproved Culver's claim that B.C.'s injuries were accidentally caused. Such a claim strikes at the heart of this case, where the fundamental question for the jury was whether B.C.'s injuries were caused by intentional, reckless, or accidental conduct. Dr. Squires' opinion regarding Culver's July 1, 2008 statement was not admitted into evidence because of the prosecutor's misconduct.

We conclude that the single cautionary instruction issued by the trial court during closing statements did not fully mitigate the prejudice cause by this misconduct because the misconduct spanned the entire

duration of the trial, and because no cautionary or curative instruction was given contemporaneous to the misrepresentation to the jury that occurred during the Commonwealth's opening statement. Indeed, the misconduct began prior to trial when the prosecutor gave a false proffer to the defense. Because this misconduct spanned the entire course of the trial, and because it affected the core issue in the case, we cannot conclude that the trial court abused its discretion in determining that such misconduct significantly contributed to an unfair trial, despite a limited cautionary instruction that occurred during the closing argument. We also conclude that the prejudice suffered due to this pattern of misconduct was sufficient to warrant a new trial in these circumstances.

### E. Leading questions

 The trial court found that the prosecutor repeatedly used leading questions with the Commonwealth's witnesses despite the trial court's admonitions and several sustained objections. The Commonwealth argues that there was no evidence that leading questions "pervaded or dominated the trial," and that in any event, "Pennsylvania appellate courts have shown an almost total unwillingness to permit a trial court to set aside a verdict" on such a basis. Commonwealth's Brief, at 29.

### 1. Merit

The trial court, however, did not state or insinuate that the prosecutor's use of leading questions "pervaded or dominated" the trial. Rather, the trial court stated that:

The Assistant District Attorney was warned by the Court to stop leading the witnesses on two separate occasions, [N.T., 3/18/10, at 204; N.T., 3/19/10, at 45], and yet he continued to do so. The Court also sustained all objections made by the Defendant to a leading question. It is clear from the record that the trial

court showed an intolerance for leading questions that the Assistant District Attorney ignored.

T.C.O., at 15.

The trial court's concern was not that it found any particular leading question or series of leading questions to have established a claim of prosecutorial misconduct of significant magnitude. Instead, the trial court's concern was that the prosecutor repeatedly refused to follow the instructions of the trial court when directed to do so. The trial court did not abuse its discretion in finding prosecutorial misconduct in this regard. The record demonstrates that the prosecutor repeatedly engaged in leading questions, despite sustained objections, and despite specific instructions to not lead the witnesses. The prosecutorial misconduct that occurred was not the use of leading questions, but the prosecutor's refusal to obey the repeated instructions of the trial court.

### 2. Prejudice

 Though, theoretically, leading questions could cause Culver undue prejudice because leading questions functionally substitute the attorney's testimony for that of a witness, there was little evidence that any particular question or series of questions contributed significantly to denying Culver a fair and impartial trial in this case. The prosecutor's refusal to adhere to the trial court's strict policy on leading questions does contribute to the overall prejudice endured as a result of the unbecoming behavior of the prosecutor during the course of the trial, yet, in comparison to the other instances of misconduct in this case, the prejudice contributed by the prosecutor's repeated use of leading questions was relatively slight. We, therefore, conclude that the prosecutor's repeated use of leading question in this instance did

not cause sufficient prejudice as to warrant a new trial.

## F. Conclusion

The trial court concluded that the resultant prejudice from the aforementioned instances of prosecutorial misconduct caused Culver to have been deprived of a fair trial. However, it is well-settled that "no number of failed claims may collectively attain merit if they could not do so individually." *Commonwealth v. Bracey*, 2001 WL 1663949 (2001) (quoting *Commonwealth v. Williams*, 532 Pa. 265, 615 A.2d 716, 722 (1992)). Hence, we cannot affirm the trial court's order granting a new trial if none of the individual findings of prosecutorial misconduct warranted a new trial.

We do not consider the misconduct resulting from the prosecutor's repeated use of leading questions alone could constitute sufficient prejudice as to warrant a new trial. However, the prosecutor's outrageous behavior during opening and closing statements, during which he engaged in acts of physical intimidation, yelling, and otherwise menacing behavior, engendered sufficient prejudice as to warrant a new trial. The prosecutor's repeated use of excessive hyperbole regarding the veracity of Culver, particularly when the prosecutor referred to Culver as a compulsive or pathological liar, also gave rise to sufficient prejudice as to warrant a new trial. And finally, the prosecutor's repeated misrepresentations of fact to the defense, to the court, and to the jury with respect to Dr. Squires' opinion of Culver's statement to Trooper Russo, were sufficiently prejudicial as to warrant a new trial. Accordingly, we conclude that the trial court did not abuse its discretion in determining that the collective misconduct engaged in by the prosecutor in this case resulted in depriving Culver of a fair trial, because we recognize sufficient prejudice warranting a new trial stemming from at least three particular occurrences of prosecutorial misconduct.

## Double Jeopardy

■ Having concluded that the trial court did not abuse its discretion in granting a new trial, we must now turn to Culver's cross-appeal of the order denying his request to bar retrial on double jeopardy grounds. After careful review, we affirm the trial court's ruling that double jeopardy does not bar retrial in this instance.

■ "An appeal grounded in double jeopardy raises a question of constitutional law. This court's scope of review in making a determination on a question of law is, as always, plenary." *Commonwealth v. Wood*, 803 A.2d 217, 220 (Pa.Super.2002) (quoting *Commonwealth v. Mattis*, 454 Pa.Super. 605, 686 A.2d 408, 410 (1996)). In determining whether double jeopardy bars retrial following a mistrial due to prosecutorial misconduct, we adhere to the following standards:

Under both the federal and state constitutions, double jeopardy bars retrial where the prosecutor's misconduct was intended to provoke the defendant into moving for a mistrial. *See Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982); *Commonwealth v. Simons*, 514 Pa. 10, 522 A.2d 537 (1987). In *Commonwealth v. Smith*, 532 Pa. 177, 615 A.2d 321 (1992), our Supreme Court recognized that the standard set forth in *Oregon v. Kennedy*, *supra*, was inadequate to protect a defendant's rights under the Pennsylvania Constitution. The Court stated:

We now hold that the double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defen-

dant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial.

*Smith,* at 186, 615 A.2d at 325 (quoted in *Commonwealth v. Martorano,* 559 Pa. 533, 537–38, 741 A.2d 1221, 1223 (1999), *rearg. denied* 1999 Pa.LEXIS 3828 (Pa.12/27/99)).

Prosecutorial misconduct includes actions intentionally designed to provoke the defendant into moving for a mistrial or conduct by the prosecution intentionally undertaken to prejudice the defendant to the point where he has been denied a fair trial. *Smith,* at 186, 615 A.2d at 325. The double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant subjected to the kind of prosecutorial misconduct intended to subvert a defendant's constitutional rights. *Id.* at 186, 615 A.2d at 325. However, *Smith* did not create a *per se* bar to retrial in all cases of intentional prosecutorial overreaching. *See Commonwealth v. Simone,* 712 A.2d 770 (Pa.Super.1998), *appeal denied,* 557 Pa. 628, 732 A.2d 614 (1998). "Rather, the *Smith* Court primarily was concerned with prosecution tactics, which actually were designed to demean or subvert the truth seeking process." *Id.* at 774–75. The *Smith* standard precludes retrial where the prosecutor's conduct evidences intent to so prejudice the defendant as to deny him a fair trial. A fair trial, of course is not a perfect trial. Errors can and do occur. That is why our judicial system provides for appellate review to rectify such errors. However, where the prosecutor's conduct changes from mere error to intentionally subverting the court process, then a fair trial is denied. *See Commonwealth v. Martorano & Daidone,* 453 Pa.Super. 550, 684 A.2d 179,

184 (1996), *affirmed[,]* 559 Pa. 533, 741 A.2d 1221 (1999). "A fair trial is not simply a lofty goal, it is a constitutional mandate, ... [and][w]here that constitutional mandate is ignored by the Commonwealth, we cannot simply turn a blind eye and give the Commonwealth another opportunity." *Martorano,* 559 Pa. at 539, 741 A.2d at 1223 (quoting *Martorano & Daidone,* 684 A.2d at 184).

*Commonwealth v. Chmiel,* 777 A.2d 459, 463–64 (Pa.Super.2001).

Culver claims that retrial should be barred in this case on double jeopardy grounds because:

> Assistant District Attorney Carbone ignored [the] trial court's instructions, attempted to physically bully and menace Culver and his attorney, repeatedly called Culver a liar and stated his own personal beliefs, misrepresented the facts of the case and showed a total disdain for legal process, the rule of law, and civilized and fair trials.

Appellee's/Cross–Appellant's Brief, at 22. Culver further argues that the prosecutor has a track record of prosecutorial misconduct that cannot be ignored, and thus the incidences of misconduct that occurred in this case cannot be viewed in a vacuum. *Id.*

The trial court ruled that the prosecutor's misconduct was not deliberately calculated to deprive Culver of a fair trial, and therefore refused to bar retrial on double jeopardy grounds. T.C.O., at 20–21. The Commonwealth, again to the discredit of the prosecutor in this case, failed to address the issue in its brief.

Our disapproval of the prosecutor's antics in this case cannot be understated. His lack of professionalism fell well below not only the unique and high standards of conduct we set for prosecutors as representatives of the Commonwealth and ad-

ministrators of justice, but also far below the level of professionalism that is expected of any member of the Pennsylvania bar. We also take note that we recently addressed this very same prosecutor's misconduct in another case, *Commonwealth v. Anderson*, 38 A.3d 828 (Pa.Super.2011) (*en banc*).

In the instant case, however, though there is plenty of smoke, we are constrained to agree with the trial court that there is no visible fire. We cannot discern a clear intent to deprive Culver of a fair trial where A.D.A. James Carbone's misconduct could largely be explained by his incompetence or mere indifference to the rights of the accused and the decorum of the court, and where there is also no direct evidence to the contrary.

Accordingly, we affirm the trial court order denying Culver's request to bar retrial on double jeopardy grounds.

Order affirmed.

Judge STRASSBURGER files a concurring opinion.

## CONCURRING OPINION BY STRASSBURGER, J.:

I agree that we should affirm the trial court's decisions that Culver is entitled to a new trial and that the prosecutor's conduct was not deliberately calculated to deprive Culver of a fair trial or to provoke him to moving for a mistrial. The 'trial court neither abused its discretion in making its factual determinations nor misapplied the law to those findings. *See Commonwealth v. Wood,* 803 A.2d 217, 220 (Pa.Super.2002) (applying to the review of the trial court's factual findings and credibility determinations in a double jeopardy case the same abuse of discretion standard utilized in review of weight of the evidence claims).